Good morning, John. Good morning, counsel. This is an immigration case in which the Board of Immigration Appeals and the immigration judge both determined that the petitioner was not credible and never reached the actual basis for the asylum claim. In both decisions, both the board and the immigration judge's decision, they took facts that they claimed were material variances and took them and created a decision out of them. Let me ask first, is there a firm resettlement issue in this case or do we look at the credibility determination as controlling? I think the credibility determination is controlling. I don't believe there is a firm resettlement issue in the case. The three errors that the original immigration judge cited and the board adopted in their decision because they affirmed the decision and then made certain additions were dates and conditions of detention and a letter. Those were the three issues. The date was corrected by the interpreter in the record in front of the judge, yet the judge in her decision adopted the incorrect date, which was interpreter error. Are you referring to the 2000 return to Armenia, that date? Yes, I am. Okay. The return date is critical because there was a demonstration on the 30th of October 2000 in which the petitioner was a minor at the time. Her mother was a member of a group called Intellectual Armenia and a journalist. And her mother had attended that. And the judge mischaracterized in the immigration judge's decision that the petitioner had attended that. When the petitioner testified, she did not. The mother was the one who attended. The mother apparently was engaged in some, we don't know for sure, but so repetitious videotaping of events. And when the officials came to the home and saw this young woman, along with her mother and a couple of other journalists, all were arrested, the petitioner was held in detention for four days. She was severely beaten. She was threatened with rape. She was threatened with we can do anything we want to you. And the purpose of her detention was to get her to sign a statement that would implicate her mother in anti-government actions. What about this matter of whether or not she received water during custody? Well, it's interesting. Of course, I was there and I had an opportunity to see the demeanor of the parties. The interpreter clearly said that the question was did you receive bread and food and water. And she said no. And the reason she said no was because the question was not disjunctive, it was conjunctive. And then when they finally changed the question to water or, then she said yes, because I had received water only when asked. And for four days she had gotten water once, never any food. And she was only permitted to go to a toilet when she asked someone to take her. She was in a bare cell. She had no facilities. There was no chair. There was no bed. There was no anything. Counsel, it seems to me you've been here at this time. I'm sorry. Go ahead. How old was she at this time? She was about 20 when she returned. She was born in September of 1980, and most of these events occurred in the year 2000. She was a college student, right? She had come to the United States on a J-1 exchange work study visa and had returned home when all of these events occurred. Yes. And did she speak English? Not well. My initial communications with her when I met her, which was prior to the initial immigration judge hearing, required an interpreter for most of the conversations in my office. She speaks English well now. She's much older. But at that time we required an interpreter, and we had one on our staff. And in court, of course, we had an interpreter throughout the entire proceeding. Do you attribute the issues regarding the water, the return date, and the issue of the communicating with her mother by phone primarily to translation errors? No. The water, food, and bread one I do. Okay. The date one I do because it's critical to understand that she returned to Armenia on October 26th, and the demonstration took place four days later. The judge implied that she left the United States and returned on November 26th, a date which only appears as a handwritten notice by, I presume, an examiner at the original asylum interview. I was not present. All of the other evidence, including her passport stamp, which is in the certified administrative record, shows that she landed on the 27th of October, 2000, en route home. So clearly if she left the United States on October 26th, what with the time difference, she landed on the 27th, she was present at the time of this demonstration, though she didn't attend the demonstration, as the immigration judge indicated. Now what about the telephone call during the time her mother was in jail? It's a very interesting question. I've never gotten to the bottom of it. Well, it seems to me that's the most difficult issue you have. It's the most difficult, and I agree. The detention, as we know in Armenia from others, may be a surveillance and a homebound detention. We just don't know. This woman, who is now 27 years old, has had no communication with her mother since that phone call. On that phone call, basically her mother told her, don't call me again. They're going to be listening, or they could be listening to a conversation. So she spoke with a neighbor, and the neighbor, who was very reluctant to tell her anything, just told her that her mother was severely beaten. Those are the facts that we know. We have no additional information, and we certainly had no information at the time of this hearing. This girl was testifying as to what she knew. As I understand the assertion, the government is that this conflicted with a statement in the affidavit. Yes, I agree that it conflicts. But we have no underlying information as to the accuracy of that letter that was sent by the Bar Association, which in essence is a request for money, if you read the letter actually carefully. They're asking for money to represent her mother. As I look at this record, counsel, it appears that when the seeming contradiction occurred and your client was about to give an answer, the government attorney started to ask for a clarification, was cut off by the IJ, and she had no further opportunity to respond. Does that correspond with your recollection? It not only corresponds with my recollection, but the off-the-record conversation was about this issue. And then when they went back on the record, the judge having, I hate to use the word steered, but having brought to the attention of Mr. Armstrong the issue, allowed him to proceed, and that was the end of the hearing. This was a very quick hearing. We were in and out of the court very fast. I'm puzzled about one thing. You were there, of course. I was there. You can help with this. Reading the IJ's decision, this judge had some real animus against your client. Why? She did. I don't know, Your Honor. And I know this judge well. I've been practicing immigration law for 30 years. She was a trial attorney, and I knew her well at that time, and I had many hearings in front of her. This one just started off on the wrong foot, on the wrong day, and the credibility issue started when we walked into the courtroom. The IJ has to back up whatever he or she concludes with some substantial evidence here. Yet here she makes statements like this is an outright lie. Yes, sir. I don't see that very often in an IJ's opinion. Can you shed any light at all as to what happened that created this ill will on the part of the IJ? I don't think I can actually characterize it as ill will. I hate to say that it was predisposition, but it may well have been. When we started the hearing, the indication that we got, and the first thing that she said to me is, Mr. Winston, stop taking notes, let's move on. She stopped me from doing the normal presentation that I would have in a case of this sort. It's in the record. It just says stop writing down the answers. Counsel, there is this cat claim. Was there, in your view, a Camalthus compliance here? In other words, was there an individualized assessment which is required by Camalthus? No, there was not. All right. Anything further? No, I'm through. Thank you, Counsel. Thank you. We'll hear from the government. May it please the Court, Donald Kubion for responding. Your Honors, I'm glad that the petitioner agrees that the question of why the mother was or could have been persecuted was not reached. At least we agree on that. I say that because in the event that the credibility ruling does not pass muster, I would think that the case would have to be remanded for that issue to be resolved, since it hasn't really been resolved. Are you talking about firm resettlement when you say that? No, Your Honors. I was referring to whether or not the mother was persecuted or is being persecuted. We don't know that much. What we do know is that part of the problem here is the erratic and haphazard way in which the petitioner presented her case throughout, and you have to . . . I did not brief this case, but in going through the record and trying to understand it, I had to really hunt and call the parts. It seems to me that the one that we're here today to discuss is what I call the third reason, which is the problem about the letter. Counsel, you would agree, would you not, that at best the IJ did a very sloppy job of trying to substantiate the credibility issues? Yes, Your Honor, I would. This is a very short decision and doesn't enjoy a lot of elaboration. And to follow on with that, you agree that PULA no longer is good law, right? Absolutely. It's superseded by regulation. Yes. Is there any contention on the part of the government that this petitioner received a firm offer of resettlement? Resettlement is not an issue. The IJ was in error in her understanding of the law. Okay. So you concede then that this matter needs to be sent back? No, I think the case can be resolved on the credibility issue and on what I call the third. Even if you have the credibility issue, though, you're saying that the issue of the asylum does not even have to be dealt with at all? Is that your position? The judge dealt with that, did she not? She resolved the case on credibility and, strangely, did not reach. She called it an imputed claim. Well, it seems to me, counsel, if we can't resolve, if we can't affirm on credibility determination, and I would suggest it's at least a close issue, then we have to send it back, because it was clearly an abuse of discretion to rule out the country shopping issue, was it not? That is correct, Your Honor. Now, what about this cat claim? The government seems to have dropped that issue in terms of its response of grief, but what about a Camalthus assessment? Was that done here or not? I would say it was, and, of course, it's a very brief one. She says, now, the petitioner briefs it as if it were denied only on adverse credibility, but actually, if you read the decision, the judge, when she gets to that issue, says on the record there's nothing to show that she's more likely than not to be tortured, and that is more than a credibility determination. That's a substantial evidence determination. But it's false, isn't it? Pardon? It's false, isn't it? I mean, if you look at the record, this woman's mother was clearly part of an anti-government political group. She was clearly jailed. This young woman's testimony was that she was jailed in any kind of a cat claim under BASIN. Membership in a particular social group includes membership in the family. So in this case, to just eschew the concept that she doesn't have a reasonable likelihood of being persecuted, doesn't that just ignore the role of her mother? Under torture, it's not persecution. It's torture. It doesn't have to be for any of the five reasons in the statute for asylum. It's just torture, and this is not – How do you define torture? Well, the regulation describes it – An interesting question these days, isn't it? Well, it is, except – well, it isn't a question, in my opinion, in this case, because she was just beaten up at the station house. I mean, I don't mean to make light of it, but that's another instance in which – being beaten up at the station house, being deprived of food and water is a form of torture? Not in this case. Can you think of any case where it might be? Well, torture under the regulations should require more than what happens here. This – we've got a very slippery slope when any time you get beat up, you're tortured. Torture requires, under the regulations – I don't have it in front of me, so I don't want to misspeak, but it talks about – 16, 17, and 18 of 8 CFR in terms that connote what we think of as torture. You have to be under the control of the authority. You have to have this profound and – So it's something that is talking about what historically we think of as torture as opposed to beating. And I think it's a very slippery slope when you start saying any time you get beat up, as horrible as it is, that you're talking about torture. She may perceive it as torture. Counsel, can I go back to the credibility determination on this third? Yes, Your Honor. What is your best argument to support the IJ's determination that the petitioner was lacking in credibility with respect to the mother being in jail in 2001 in the conflict with the affidavit? The three – among the three bases that were proffered or relied upon by the fact finder – I'm asking you to discuss the last basis. Yes. That's the one that troubles me in any event. That's the one I'm relying on. That's the one I'm relying on today, Your Honor. All right. And what's your best argument in defense of the IJ? The letter from the Bar Association procured at her request by her father shortly before the evidentiary hearing stated that the mother was in detention and had been in detention at internal security in the capital since February of 2003, whereas her – I think it's a declaration, but her testimony – clearly indicates or plainly indicates that she spoke with her one time in the latter part of the year she arrived here and not before and not thereafter, even though she tried. And I disagree with the petitioner when they say it wasn't resolved because the petitioner was asked by the immigration judge, can you explain why there's this apparent discrepancy between the letter that you've proffered and your testimony and so forth? And her answer – and this is at 89 to 90 in the record, in the transcript – is plainly, I don't know. And that's the explanation. But, Counsel, under Singh – and I'm quoting here – the IJ must provide specific cogent reasons for reaching an adverse credibility determination and minor inconsistencies or factual omissions that do not go to the heart of the asylum claim are insufficient to support it. Judge O'Scanlan has asked you to give it your best shot for this number three. Articulate, though it was, can you seriously argue that that really meets the Singh standard in this case? Well, I have to. I mean – I know you have to. You're an advocate of the government. No, no. I didn't mean it in that flippant way, Your Honor. I mean, if I were – no, I mean, I've confessed error before on that argument. So I'm not afraid to do that. And I did say that we were here to talk about the third reason. Right. But what I'm trying to get you to – I understand what you're saying. What I'm trying to get you to wrestle with is the simple fact that this IJ does not meet the burden under that third element, did she? I think it's a close call. All right. Thank you, Counsel. Your time has expired. Yes. The case just argued will be submitted for decision, and we will hear argument in Lavina v. San Luis Coastal Unified School District.
judges: O'scannlain, Smith, Mosman